FILED

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

02 JUN 17 PM 2: 56

U.S. DISTRICT COURT
N.D. OF ALABAMA

KRISTIE CURTIS, DEMETRIUS )
HUBBARD, FRONCHIER WATTS- )
ANDERSON-ANDERSON,   and )
KIMBERLY WHITE, )
 )
   Plaintiffs, )
 )
v. )  CV 01-BU-2331-S
 )
TELETECH  CUSTOMER  CARE )
M A N A G E M E N T )
(TELECOMMUNICATIONS), )  ENTERED
INC., )
 )  JUN 17 2002
   Defendant. )

## Memorandum Opinion

    In this action, four plaintiffs brought claims alleging that Defendant TeleTech Customer Care Management Telecommunications, Inc. ("TeleTech") is liable for discriminating against them because of race, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq.; and 42 U.S.C. § 1981. Now before the Court is TeleTech's motion for summary judgment with regard to the claims of the sole remaining plaintiff, Kimberly White (hereinafter "Plaintiff") (Doc. 42). Upon consideration of the record and the arguments of counsel, the Court concludes that

58

TeleTech's motion is due to be **GRANTED**.

## I.   SUMMARY JUDGMENT STANDARDS

On a motion for summary judgment, the court assesses all of the proof the parties can bring to bear in order to ascertain whether a genuine need for trial is present. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986). Summary judgment is weighed heavily in favor of the non-movant; it is appropriate only if the court concludes that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). See <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). A party seeking summary judgment has the initial responsibility of informing the Court of the grounds for its motion and specifically identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits that it believes demonstrate the absence of a genuine issue of material fact. <u>Celotex</u>, at 323. This implies that the movant must direct the court to materials in the record that either negate an element of the non-moving party's claim or demonstrate that the non-movant will not be able to meet its burden of proof at trial; it is never enough for the movant simply to state that the non-moving party cannot meet its burden at trial. <u>Mullins v. Crowell</u>, 228 F.3d 1305, 1313-14 (11${}^{th}$ Cir. 2001);

Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11${}^{th}$ Cir. 1991). Once the moving party has satisfied its initial burden, however, the nonmoving party must point to evidence in the record indicating that there is a genuine issue of fact for trial, i.e., there must be sufficient evidence to allow a factfinder reasonably to return a verdict in the nonmovant's favor. See Liberty Lobby, 477 U.S. at 248, 252. In resolving whether a given factual dispute requires submission to a jury, a district court must view the record in the light most favorable to the nonmoving party and resolve all reasonable inferences in the nonmovant's favor. Rooney v. Watson, 101 F.3d 1378, 1380 (11${}^{th}$ Cir. 1996) (citing Hale v. Tallapoosa Co., 50 F.3d 1579, 1581 (11${}^{th}$ Cir. 1995)). "That is, the court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted or unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 151 (2000) (quoting 9A C. Wright & A. Miller, Federal Practice and Procedure § 2529, p.299). Keeping these standards in mind, the Court turns to the record in this case.

## II. BACKGROUND[1]

---

[1] "The facts set out below are gleaned from the parties' submission of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of

Plaintiff Kimberly White is an African-American woman. She began her employment with Defendant TeleTech at its Fairfield, Alabama facility (the "Fairfield Facility") on or about April 26, 1999. Initially, she worked as an Operations Supervisor. At some point in October 1999, she was transferred to a Staff Support Specialist position.

Beginning September 20, 1999, Plaintiff was assigned to work on the night shift. At that time, her salary was increased by five percent, pursuant to a TeleTech policy to pay such additional percentage to compensate employees for the hardship of working on the night shift. On October 9, 2000, Plaintiff was moved to the day shift, and her salary was reduced by 5%, because of the shift differential. The decision to move Plaintiff to the day shift was made by Michelle Kells, a white female who was the Senior Operations Manager at the Fairfield Facility.

Plaintiff applied for and was awarded leave under the Family Medical Leave Act, to commence December 7, 2000 and run through March 6, 2001. Upon returning to work on March 7, 2001, Plaintiff was assigned to work again as an Operations Supervisor. She has served in that role from that time until the present. On April 9,

---

the record. These are the 'facts' for summary judgment purposes only. They may not be the actual facts. See Cox v. Administrator U.S. Steel & Carnegie, 17 F.3d 1386, 1400 (11th Cir. 1994)." Underwood v. Life Ins. Co. of Georgia, 14 F.Supp. 2d 1266, 1267 n.1 (N.D. Ala. 1998).

2001, Plaintiff again was moved from the day shift to the night shift, and once again her salary was increased by 5%.

Count VI of the Amended Complaint contains Plaintiff's claims against TeleTech. Therein, she contends that she has been subjected to a "[p]ay [d]isparity" and other "[a]dverse [t]erms, [c]onditions & [p]rivileges" of employment because of race, in violation of Title VII and Section 1981. Amended Complaint at 6. More specifically, Plaintiff alleges that Kells has a racial bias against African Americans and that she "forced plaintiff to changed [sic] her shift thereby lowering her bay because of the shift differential." Id. ¶26. Plaintiff concludes by asserting, "Only African American individuals were forced to change their shift. No Caucasian employees [sic] pay was lowered." Id.

### III.   CONTENTIONS & ANALYSIS

Plaintiff alleges that she was subjected to race discrimination, in violation of Title VII and Section 1981, by virtue of being transferred to the day shift and losing the 5% shift differential. Plaintiff originally asserted other disparate treatment claims based upon allegations that she was not given certain job-related information and that Kells criticized her work to other managers. See Amended Complaint ¶¶25 & 26. However, Plaintiff has expressly abandoned all but the claims relating to her shift change and the associated pay shift differential she

lost. See Plaintiff's Brief in Opposition at 4. Thus, only the shift transfer/pay differential claims are still potentially viable at this point, and TeleTech is entitled to summary judgment on all other claims brought by Plaintiff.

Title VII[2] and Section 1981[3] each prohibit certain forms of discrimination because of race in the employment setting. The Eleventh Circuit has recognized that claims alleging unlawful disparate treatment in employment based upon race have the same substantive proof requirements under Title VII and Section 1981 and are analyzed under the same framework. See, e.g., Bass v. Board of County Com'rs, Orange County, Florida, 256 F.3d 1095, 1109 n. 4 (11th Cir. 2001); Standard v. A.B.E.L. Services, Inc., 161 F.3d 1318, 1330 (11th Cir. 1998). Thus, the Court will address TeleTech's arguments that it is entitled to summary judgment on Plaintiff's Title VII claims with the express understanding that the analysis applies with equal force to her parallel Section 1981

---

[2]Title VII prohibits an employer from "discharg[ing] any individual or otherwise discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

[3]Section 1981 guarantees to all persons in the United States "the same right ... to make and enforce contracts ... as is enjoyed by white citizens." 42 U.S.C. § 1981(a). Following the passage of the Civil Rights Act of 1991, the term "make and enforce contracts" is broadly defined as including "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b).

claims. See Standard, 161 F.3d at 1330.

TeleTech argues that it is entitled to summary judgment on Plaintiff's Title VII and Section 1981 race discriminations claims based upon her transfer to the day shift on October 9, 2000 and the resulting 5% drop in her pay because of the shift differential. While analyzing this claim might seem relatively straightforward, a threshold dispute has arisen with regard to the precise employment decision that Plaintiff is claiming to have been based on race. TeleTech's argument in its initial summary judgment brief is founded upon the assumption that this claim is based upon the theory that Plaintiff was subjected to a racially discriminatory, disadvantageous transfer. That is, what TeleTech understands Plaintiff to be challenging as racially discriminatory is Kells's decision to transfer her from the night to the day shift, with such transfer being adverse because it caused Plaintiff's pay to be reduced through the uniform application of the company's race-neutral shift differential policy, i.e., paying employees working on the night shift 5% more than for working on the day shift. See Defendant's Brief at 7 (wherein TeleTech articulates this claim as alleging "that [Plaintiff's] supervisor forced her to change shifts thereby lowering her pay because of the loss of the shift differential pay.") With the claim thus framed, TeleTech proceeds to argue that summary judgment is warranted upon on the following

grounds: (1) because Plaintiff admitted that she "did not have a problem" with being transferred from the night shift to the day shift, see Plaintiff's Depo. at 40-41, she cannot now be heard to complain about the transfer; (2) Plaintiff allegedly cannot show that similarly situated white employees were treated more favorably with respect to being transferred to the day shift; and (3) the evidence indicates that Kells transferred Plaintiff to the day shift because Kells wanted Plaintiff to be available during the daytime hours of operation of TeleTech's clients, and Plaintiff allegedly cannot show that such reason is a pretext for race discrimination.

In response to TeleTech's motion for summary judgment, however, Plaintiff maintains that TeleTech "has mischaracterized this claim as one for disparate treatment in transfers." Plaintiff's Brief in Opposition at 4 n.1. Plaintiff says that the claim in question is instead one alleging disparate pay, in that her salary was reduced 5% when she was transferred to the day shift while similarly situated Caucasian employees who had been transferred to the day shift allegedly did not have their pay so reduced. See id. at 4 & n.1, 5-7. In other words, Plaintiff is now arguing that, upon being transferred to the day shift, she was subjected to a race-based application of TeleTech's 5% shift differential pay policy, in violation of Title VII and Section

1981. Accordingly, as currently conceived, Plaintiff is not attacking as racially discriminatory the decision <u>to transfer</u> her to the day shift but rather the decision <u>to reduce her salary by five percent</u> upon transferring her.

In its reply brief, TeleTech argues that Plaintiff has sought to change her theory of this claim. The Court agrees with TeleTech insofar as it contends that the amended complaint suggests that Plaintiff was bringing claims under Title VII and Section 1981 founded upon allegations that she was subjected to an adverse shift transfer because of race. Again, the amended complaint states: "Kells forced plaintiff to changed [sic] her shift thereby lowering her bay because of the shift differential. Only African American individuals were forced to change their shift. No Caucasian employees [sic] pay was lowered." Amended Complaint ¶26. Indeed, it would appear that Plaintiff herself conceived that Kells's discrimination was manifested by the decision to transfer black employees, as she stated during her deposition: "[T]he shift swapping was done basically to people of African American background. . . . . Her intent was to remove someone that was black from that position." Plaintiff's Depo. at 68. However, the Court concludes that, by asserting that TeleTech has mischaracterized her claim as a disparate transfer claim and that she is pursuing only a disparate pay theory, Plaintiff has now

abandoned any discriminatory transfer claims. Further, she has failed to respond to TeleTech's supported motion for summary judgment on such claims. Therefore, summary judgment shall be granted on Plaintiff's discriminatory transfer claims brought under Title VII and Section 1981.

The Court also has some doubts about whether Plaintiff's allegations in the Amended Complaint actually encompass her disparate pay claim as she now presents it. It is true that the heading of Count VI of the Amended Complaint contains the words "[p]ay [d]isparity," and Plaintiff did allege that "[n]o Caucasian employees [sic] pay was lowered."[4] However, at no time has Plaintiff ever stated either in her EEOC charge, her amended complaint, or during her deposition that white employees were transferred to the day shift but not subjected to a 5% loss in salary pursuant to the shift differential policy, as she now claims. Nonetheless, TeleTech does not actually argue that the

---

[4] Of course, both of these phrases can be viewed as consistent with her express claim that "Kells forced [her] to change[ ] her shift thereby lowering her pay because of the shift differential." That is, Plaintiff was subjected to a "pay disparity" in the sense that her pay was lowered when she was forced to change to the day shift, and her claim that "[n]o Caucasian employees' pay was lowered" could be seen as simply describing the consequences of the sentence in the Amended Complaint that immediately precedes it: "Only African American individuals were forced to change shifts." If only African Americans were forced to change shifts, then there would be no occasion to lower Caucasian employees' pay pursuant to the shift differential policy. The Court would also note that Plaintiff's allegation that only African Americans were forced to change shifts would seem inconsistent with her current theory of her claim, which is that Caucasians were asked to change their shifts after all, but that they allegedly were not subjected to a 5% loss in pay when such shift changes occurred.

Court should not consider Plaintiff's disparate pay claim because it is not sufficiently set forth in her pleading. Rather, TeleTech has chosen to argue simply that it is entitled to summary judgment on the merits of the claim. Accordingly, the Court will proceed directly to consider TeleTech's summary judgment arguments.

Plaintiff attempts to prevail on her claim alleging that TeleTech subjected her to a race-based application of its shift differential policy by using circumstantial evidence. Accordingly, the Court applies the burden-shifting framework established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and Texas Department of Community Affairs v. Burdine, 450 U.S. 248 (1981). Under this analysis, a plaintiff must first establish a prima facie case of discrimination, which creates a presumption of discrimination. The employer must then produce sufficient evidence to indicate that it took the employment action in question for one or more legitimate, nondiscriminatory reasons. If the employer does so, the presumption of discrimination drops from the case, and the burden shifts back to the plaintiff to discredit the proffered nondiscriminatory reasons by showing that they are merely a pretext for unlawful discrimination. See McDonnell Douglas, 411 U.S. at 802-05; Burdine, 450 U.S. at 252-256.

In order to establish a prima facie case of discrimination on

this claim, Plaintiff must present evidence indicating that one or more similarly situated employees of another race received more favorable treatment with regard to compensation.  See generally Pittman v. Hattiesburg Municipal Separate School Dist., 644 F.2d 1071, 1074 (5th Cir. Unit A 1981).  TeleTech argues that Plaintiff cannot do so with respect to its shift differential policy, because its policy is uniformly to pay employees an additional 5% for working on the night shift.  Plaintiff claims, however, that the evidence indicates that while Kells forced her to change shifts and that her pay was therefore reduced 5% pursuant to the shift differential policy, Kells also switched two white managers, Michael Webb and Kelly Lang, to the day shift but they did not suffer a corresponding loss in pay.

In support of her allegations on this issue, Plaintiff refers the Court only to the following testimony of Scott Beatty, the Human Resources Manager of the Fairfield Facility offered for deposition as TeleTech's corporate representative under Federal Rule of Civil Procedure 30(b)(6).  With regard to which employees Kells had made change shifts, Beatty testified:

> Q. As I understand that response, there is not a record of what shift changes Michelle Kells was making while she was an employee?
>
> R. There's not a written record, no.
>
> Q. Is there a verbal record that you are aware of?

>    A.   The only record that I'm aware of is that she asked
>         several people over the course of their employment
>         to change shifts for business reasons.
>
>    Q.   Do you know who those people are?
>
>    A.   All the current management team has, at one point
>         in time, been asked to change their schedule.
>
>    Q.   Who is on the current management team?
>
>    A.   Gemel Clark, Michael Webb, Kelly Lang.

Beatty Depo. at 33-34.  Beatty confirmed that Webb and Lang are white, while Clark is black.  Id. at 36.  And finally, Plaintiff cites a portion of Beatty's testimony in which her counsel queried him about whether Kells had ever changed the shifts of Lang, Webb, or Clark such that any of those employees suffered a loss in pay, as follows:

>    Q.   Are you aware of Michelle Kells ever changing Kelly
>         Lang's shift such that he had a reduction in pay?
>
>    A.   Kelly is female, and no, because she never worked a
>         night shift that I'm aware of.
>
>    Q.   Are you aware of Michelle Kells making any change
>         in shifts that resulted in Michael Webb having a
>         loss in pay?
>
>    A.   I don't believe so.

Id. at 40-41.  The Court concludes, however, that a close inspection of the above portions of Beatty's deposition relied upon by Plaintiff reveals that such testimony is insufficient to create an issue of fact with respect to whether Webb or Lang was actually

transferred from the night shift to the day shift and did not have a corresponding pay reduction under the shift differential policy.

Beatty does state that Kells "asked several people over the course of their employment to change shifts," and immediately thereafter that "[a]ll the current management team," which included Webb and Lang, had "been asked to change their schedule." Beatty Depo. at 33. The Court acknowledges that such testimony reasonably suggests Webb and Lang had at least been "asked" to change their shift schedules at some point. It is not clear from these somewhat vague statements, however, whether either Webb or Lang ever did, in fact, change shifts after being "asked" to do so. Nor can it be determined whether any such shift changes, assuming that they actually occurred, entailed moving from the night shift to the day shift (which would carry a 5% decrease in pay under the shift differential policy) or from the day shift to the night shift (which would carry a 5% increase in pay under the policy).

But even if Beatty's vague statements about managers being "asked" to change shifts might be susceptible, when viewed in isolation, to an interpretation that Webb or Lang did change shifts at some point, Beatty's testimony just moments later clarifies that he is not aware of Lang ever having actually worked a night shift at all, nor that Kells made any change in shifts that resulted in Webb having a loss in pay. Id. at 40-41. Beatty's clear testimony

that he is not aware of Lang ever working a night shift precludes the possibility that his ambiguous testimony that "[a]ll the current management team [had] been asked to change their schedule" is sufficient evidence from which to infer both that Lang had actually been moved from the night shift to the day shift and that she failed to have her pay reduced 5% pursuant to the shift differential policy. Thus, Beatty's testimony does not aid Plaintiff in showing that Lang received more favorable treatment.

Nor does Beatty's testimony regarding Webb sufficiently suggest that he received more favorable treatment. Plaintiff interprets Beatty's response indicating that he does not "believe" that he is "aware" of Kells making any change in shifts that resulted in Webb having a loss in pay to mean that Kells did, in fact, move Webb from the night shift to the day shift and that Webb did not have a loss in pay. However, such conclusions are entirely speculative. Even considering Beatty's additional statement that all managers were "asked" to change their schedules, just because Beatty may not be "aware" of Kells making Webb change shifts so as to result in a loss in his pay does not, as a matter of logic, give rise to the necessary inferences that (1) Webb's shift was, in fact, changed (as opposed to merely being "asked" to have his shift changed); (2) that such change was from the night to the day shift (as opposed to the day shift to the night shift, which would have

resulted in Webb receiving an increase in pay); and (3) that Webb's salary was not actually reduced pursuant to the shift differential policy.

Based on the foregoing, the Court concludes that Beatty's deposition testimony, the only evidence referenced by Plaintiff on the matter, is insufficient to create a genuine issue of fact regarding whether either of Plaintiff's would-be comparators, Michael Webb and Kelly Lang, were transferred from the night shift to the day shift and did not have their pay reduced under TeleTech's shift differential policy. Because she has failed to show that Webb, Lang, or any other similarly situated person of another race received more favorable treatment with regard to compensation, the Court concludes that her prima facie case fails. Accordingly, summary judgment is warranted on Plaintiff's disparate pay claim.

IV. CONCLUSION

The Court concludes that TeleTech's motion for summary judgment on the claims of Plaintiff Kimberly White (Doc. 42) is due to be **GRANTED**. The Court has determined that there is no genuine issue of material fact and that TeleTech is entitled to judgment as a matter of law on all claims brought by Plaintiff White. Fed. R. Civ. P. 56(c). Accordingly, all of her claims are due to be **DISMISSED** with prejudice. A separate order will be entered.

**IT IS SO ORDERED**, this \_\_\_14th\_\_\_ day of June, 2002.

_____
H. DEAN BUTTRAM, JR.
UNITED STATES DISTRICT JUDGE