UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

FILED

02 JUN 17 PM 2: 57

U.S. DISTRICT COURT
N.D. OF ALABAMA

KRISTIE CURTIS, DEMETRIUS )
HUBBARD, FRONCHIER WATTS- )
ANDERSON-ANDERSON,    and )
KIMBERLY WHITE, )
)
    Plaintiffs, )
)
v. )    CV 01-BU-2331-S
)
TELETECH   CUSTOMER   CARE )
M A N A G E M E N T )
(TELECOMMUNICATIONS), )
INC., )
)
    Defendant. )

ENTERED

JUN 17 2002

## Memorandum Opinion

    In this action, four plaintiffs brought claims alleging that Defendant TeleTech Customer Care Management Telecommunications, Inc. ("TeleTech") is liable for discriminating against them because of race, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq.; and 42 U.S.C. § 1981. Two of the plaintiffs, Kristie Curtis and Demetrius Hubbard, have filed stipulations of dismissal of their claims. See Doc's 52 & 53. Now before the Court are two motions. One is a motion for summary judgment filed by TeleTech concerning the claims brought by

Plaintiff Fronchier Watts-Anderson (hereinafter "Plaintiff") (Doc. 41), and the other is a motion filed by Plaintiff who asks the Court to strike certain portions of several affidavits filed by TeleTech in support of its motion for summary judgment. (Doc. 50).[1] Upon consideration of the record and the arguments of counsel, the Court concludes that TeleTech's motion for summary judgment on Plaintiff's claims is due to be **GRANTED** and that Plaintiff's motion to strike is due to be deemed **MOOT**.[2]

### I.   SUMMARY JUDGMENT STANDARDS

On a motion for summary judgment, the court assesses all of the proof the parties can bring to bear in order to ascertain whether a genuine need for trial is present. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Summary judgment is weighed heavily in favor of the non-movant; it

---

[1]On the same day that it filed its motion for summary judgment on the claims of Plaintiff Fronchier Watts-Anderson, TeleTech also filed a motion for summary judgment on the claims of the other remaining plaintiff, Kimberly White. (Doc. 42). Both of these pending summary judgment motions are now under submission. However, the Court finds that the claims of Watts-Anderson and White arise out of sufficiently distinct facts that the two motions for summary judgment seeking dismissal of those claims can be analyzed and resolved in a clearer fashion by treating the motions separately. Thus, TeleTech's summary judgment motion pertaining to Plaintiff White's claims shall be addressed in a separate order.

[2]Plaintiff contends that certain statements in several witnesses' declarations are due to be excluded on a variety of bases, including that they are not made on personal knowledge as required by Fed. R. Civ. P. 56(e). Having reviewed the statements and the parties' contentions, the Court is strongly inclined to believe that all or at least the great majority of the statements are admissible. However, because it concludes that TeleTech is entitled to summary judgment even if all of the statements in question are excluded, the Court will simply assume that they are inadmissible and will not consider them.

is appropriate only if the court concludes that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). A party seeking summary judgment has the initial responsibility of informing the Court of the grounds for its motion and specifically identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits that it believes demonstrate the absence of a genuine issue of material fact. <u>Celotex</u>, at 323. This implies that the movant must direct the court to materials in the record that either negate an element of the non-moving party's claim or demonstrate that the non-movant will not be able to meet its burden of proof at trial; it is never enough for the movant simply to state that the non-moving party cannot meet its burden at trial. <u>Mullins v. Crowell</u>, 228 F.3d 1305, 1313-14 (11th Cir. 2001); <u>Clark v. Coats & Clark, Inc.</u>, 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party has satisfied its initial burden, however, the nonmoving party must point to evidence in the record indicating that there is a genuine issue of fact for trial, <u>i.e.</u>, there must be sufficient evidence to allow a factfinder reasonably to return a verdict in the nonmovant's favor. <u>See</u> <u>Liberty Lobby</u>, 477 U.S. at 248, 252. In resolving whether a given factual dispute requires

submission to a jury, a district court must view the record in the light most favorable to the nonmoving party and resolve all reasonable inferences in the nonmovant's favor. Rooney v. Watson, 101 F.3d 1378, 1380 (11th Cir. 1996) (citing Hale v. Tallapoosa Co., 50 F.3d 1579, 1581 (11th Cir. 1995)). "That is, the court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted or unimpeached, at least to the extent that that evidence comes from disinterested witnesses.' " Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 151 (2000) (quoting 9A C. Wright & A. Miller, Federal Practice and Procedure § 2529, p.299). Keeping these standards in mind, the Court turns to the record in this case.

## II.  BACKGROUND[3]

Plaintiff Watts-Anderson is African-American. She began her employment with Defendant TeleTech in April 1999 as an Operations Supervisor at TeleTech's Fairfield, Alabama facility (the "Fairfield Facility"). On or about November 8, 1999, she was promoted to the position of Management Development Consultant

---

[3]"The facts set out below are gleaned from the parties' submission of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the record. These are the 'facts' for summary judgment purposes only. They may not be the actual facts. See Cox v. Administrator U.S. Steel & Carnegie, 17 F.3d 1386, 1400 (11th Cir. 1994)." Underwood v. Life Ins. Co. of Georgia, 14 F.Supp. 2d 1266, 1267 n.1 (N.D. Ala. 1998).

("MDC") at the Fairfield Facility.   In the MDC post, one of Plaintiff's main responsibilities was to serve as a consultant on leadership issues to the Fairfield Facility's management team.  Her primary duties also included training, or what the parties term "facilitating," managers and supervisors at the Fairfield Facility on leadership issues through the hosting of various presentations and workshops.

Plaintiff was selected for the MDC position by Leon Lachance, TeleTech's Senior Manager for North American Dedicated Centers for Leadership Development and Effectiveness.  Lachance, a white male, also became Plaintiff's direct supervisor.   However, because Lachance was based at TeleTech's corporate headquarters in Denver, he visited the Fairfield Facility rarely, only a few days per year by Plaintiff's estimation.  Accordingly, Lachance kept in touch with Plaintiff mostly by telephone and electronic mail, and he relied upon those same means to communicate with the management of the Fairfield Facility to help keep himself apprized of Plaintiff's work performance.

Plaintiff's MDC position technically fell under the umbrella of TeleTech's Human Resources Department.   Thus, the Fairfield Facility employee with whom Plaintiff tended to work most closely on a day-to-day basis was its Human Resources Manager, Robert Walker, a white male.  Walker also provided Lachance with much of

the initial feedback regarding Plaintiff's job performance, which Walker viewed as largely favorable. Lachance Declaration, Exhibit D to Defendant's Evidentiary Submission ("Lachance Declaration"). However, in about March 2000, Plaintiff also began working with Michelle Kells, a white female hired as the Fairfield Facility's Training Manager. Kells, who was subsequently promoted to Senior Operations Manager, began to express discontent to Walker, Lachance, and others about Plaintiff's performance. Walker, however, considered most of Kells's criticism to be unfounded, and he told Plaintiff that she "needed to watch [her] back" because Kells had been complaining about her and "was basically out to get [her]." Plaintiff Depo. at 104.

Early in her tenure as MDC, Plaintiff was one of 13 employees who were members of the Fairfield Facility's Center Leadership Team ("CLT"). However, when Chris Mitchell became the Site Manager of the Fairfield Facility in about February 2000, he decided that there were too many people serving on the CLT. Mitchell, a white male, initially indicated that he was going to reduce the CLT membership to include only himself and his three direct subordinates, who each happened to be white.[4] Although Mitchell

---

[4]Mitchell's direct subordinates at that time were Senior Operations Manager Michelle Kells, OCC Manager Lynn DeAnda, and the then-Training Manager Jessica Carleson. See Plaintiff's Depo. at 98.

almost immediately added three other employees who did not report directly to him, two of whom were black,[5] Plaintiff and several other former members continued to be excluded from regular CLT meetings.[6]   Although both Plaintiff and Lachance attempted to convince Mitchell that Plaintiff belonged on the CLT,   Mitchell resisted that suggestion.   He did, however, grudgingly permit Plaintiff to attend occasional CLT meetings as a guest of Walker when it was anticipated that the issues to be discussed would directly relate to her.   Plaintiff also continued to meet with Mitchell individually.

In connection with preparing Plaintiff's evaluation in mid-October 2000, Lachance solicited feedback regarding Plaintiff's performance during the previous quarter from a number of management personnel.   According to Lachance, he received negative appraisals of Plaintiff's performance from Mitchell, Kells, OCC Manager Lynn DeAnda, Operations Manager Gemel Clark, Staff Support Kimberly White, and Earline Phillips, a visiting Senior Manager of Training

---

[5]These other employees appear to have been Human Resources Manager Robert Walker (white male), CNS Manager Demetrius Hubbard (black male (and also a plaintiff in this action)), and Facilities Supervisor Homer Lee (black male).  Plaintiff's Depo. at 98.

[6]In addition to Plaintiff, the former CLT members who continued to be excluded from regular meetings appear to have been Operations Managers Michael Webb (white male) and Angela Ellis (black female), Staff Support Specialists Kimberly White (black female (and also a plaintiff in this action)) and Christina Martin (white female), and Administrative Assistant Koriya Hatcher (black female).

Development & Effectiveness at TeleTech's London, Ontario facility. Id.  The record reveals greater specifics with regard to some of the input given by several of these employees.

In a brief e-mail reply to Lachance dated October 19, 2000, DeAnda acknowledges that Plaintiff was "[v]ery professional," "tries hard," and that her "[a]ccomplishments have been good." Exhibit F to Defendant's Evidentiary Submission as to Watts-Anderson-Anderson-Anderson, ("Termination Documentation") at 1. DeAnda, who is a white male, also suggested, however, that her facilitation skills "need[ed] development," that she sometimes attempted to communicate new programs prior to having a good understanding of them, and that "she should be doing more" to add value to the center.  Id.

Clark, an African-American female, also had some complimentary things to say about Plaintiff in her e-mail reply to Lachance.  She recognized that Plaintiff had demonstrated "[e]xcellent" professionalism, that she "continuously communicate[d] to the center any changes or new programs that she has going on," and that she had "great follow up and follow through" on projects and proposals directed to her.  Id. at 2.  However, Clark also leveled a number of pointed, negative assessments of Plaintiff's facilitation, organization, and planning skills, as follows:

[Facilitation] is the number one area in which Fran needs

to improve. I have attended some of her classes and just
recently I facilitated [the] Spotlight on Development
[workshop] with her. Her classes tend to drag and quite
often the groups lose focus. Several class participants
have said specifically that the classes are 'just boring'
and they don't get much out of them. I saw the
evaluations from the Spotlight class and they seemed
great but the informal verbal commentary afterwards
painted a very different picture. Also, I have noticed
that there are some issues with preparation. Finally, I
don't think Fran has spent enough time with the actual
material; Lots of impromptu situational questions she
does not answer very well or at all. . . . Her tendency
is to restate the material instead. . . . In organizing
and planning I think Fran has some room for improvement.
At least one facilitation was canceled without any notice
to the floor. As a result, I had [supervisors] that
changed their schedules and showed up ready for a class
that did not occur. . . . Also, during one part of the
facilitation, she simply read the material then confessed
that she had not had time to look at it beforehand.

Id. at 3. In addition, Clark opined that Plaintiff was "perceived

to add no value" to the Fairfield Facility, although Clark stated

that she herself believed Plaintiff added "some value," especially

with regard to developing and researching proposed changes to

workshop curriculum. Id. at 2. Finally, Clark recognized a lack

of influence on Plaintiff's part, as she noted that management

"does not take its cues from the MDC," and that Plaintiff "has

little impact on Center decisions." Id.

In her declaration, Phillips states that she told Lachance in

November 2000 that she believed that Plaintiff was not suited for

the MDC role, based upon Phillips's experience co-facilitating a

workshop with Plaintiff during a visit to the Fairfield Facility in

August 2000.   Phillips Declaration, Exhibit E to Defendant's
Evidentiary Submission ("Phillips Declaration") at ¶10.   Phillips
characterizes Plaintiff's section of the program as "poorly
presented" and alleges that she read the material from overhead
slides and kept her back to the participants while she taught.   Id.
¶7.   Phillips also avers that Plaintiff did not seem to understand
the material adequately and that she tended simply to re-read or
re-state the material when confronted with questions from class
participants.   Id.   Finally, Phillips quoted Plaintiff as
complaining that her evaluations, which Plaintiff would not allow
Phillips to see, were "bad."   Id.

On or about January 3, 2001, Lachance discussed Plaintiffs'
perceived performance problems with her.   During this conversation,
Lachance gave Plaintiff a performance plan under which she would
have two-and-one-half weeks to improve in a number of specific
areas, and he indicated if she was unable to do so she needed to
consider whether she was right for the MDC role.   Termination
Documentation at 4-5.   In particular, Lachance urged Plaintiff to
"[p]ush your way into [the] CLT . . . [and to] sell and tell them
why you need to be in there," so that she might assert greater
influence in decisionmaking.   Id. at 4.   Lachance also noted that,
while her "[f]acilitation skills [were] getting better," they were
"still not there" and that she needed to work on her ability to

answer challenging questions from class participants.  Id. at 4-5.
According to Plaintiff, Lachance told her that he had been
receiving some negative feedback about her facilitation skills,
although she claims that Lachance also acknowledged during this
conversation that he had never himself actually seen her facilitate
a class other than when she had given a presentation during the
interview process for the MDC position.  See Plaintiff's Depo. at
137.

As noted previously, Kells complained to Lachance about
Plaintiff's performance in the MDC role on multiple occasions.  One
of these is documented in an e-mail she sent on or about February
13, 2001, wherein she stated as follows:

> Due to continuing negative feedback from [Birmingham]
> newly promoted Supervisors that the 2-day New Supervisor
> Orientation Program is of no value, I have asked Fran
> Watts to no longer facilitate the training.  . . . The
> feedback that has been shared with me is that the
> Supervisors are learning more by watching seasoned
> [Supervisors] in action.
>
> In early December, 4 Supervisors attended the last
> scheduled 2-day New Supervisor Orientation with Fran.
> Those [Supervisors] shared with their Operations Manager
> and me that they sat in a conference room while Fran read
> the material to them for 2 days.  One supervisor said
> that he would have rather been given the book and took it
> home to read.
>
> I wanted to share this feedback with you to let you know
> one of the struggles our [Birmingham] Operations
> Management Team is facing with Fran Watts as the MDC.  I
> have attempted to work with Fran on several occasions and
> she truly appears to be sincere with her position.

However, I am finding other resources to assist our Managers and Supervisors in their development.  Fran continues to not meet her deliverables on the IBP Teams that she is involved with and is not following through on scheduled Training and Development Class - pilot of Effective Communication and Behavioral Interviewing. Unless she is pushed by the IBP Team Leader she will not commit or when she does commit, she gives 1 day notice of the class.

We have talked on several occasions of my concerns with Fran.  Yet, the performance has not improved.  I am concerned that [Birmingham] has this wonderful MDC position that could be so valuable to the improved success of our [center] and the person in the role is not fulfilling the requirements of the job.

Termination Documentation at 8.

From February 11-15, 2001, Plaintiff was scheduled to co-facilitate an Improved Business Performance ("IBP") workshop at the Fairfield Facility with Peter Zeidler, the Senior Manager of Quality Services from TeleTech's Denver headquarters.  Plaintiff acknowledges that she received the materials and reviewed them, but she ultimately did not co-facilitate the class.  According to her, Zeidler asked her what part she wanted to do, and they "mutually agreed" that he would teach the whole class and that she would just provide examples to illustrate the subject matter.  Plaintiff's Depo. at 149-50.  Zeidler maintains, however, that they had agreed well in advance of the program to split the IBP facilitation duties evenly, but Plaintiff informed him about 30 minutes before the workshop was to begin that she did not feel comfortable with the

material and that she was not prepared to conduct her portion. Zeidler Declaration, Exhibit G to Defendant's Evidentiary Submission ("Zeidler Declaration"). Zeidler contends that he was thus required to teach the entire five-day workshop himself and that even the examples Plaintiff offered were inappropriate to illustrate the material.  Id.

On or about February 19, 2001, Zeidler returned to Denver and told Lachance that Plaintiff had, on short notice, expressed that she was uncomfortable with the material and declined facilitating any portion of the IBP class.  Lachance Declaration; Termination Documentation at 10.  Zeidler further told him that Plaintiff was "unfocused" and "didn't pay attention" to what was going on around her, offering as an example that he, Zeidler, had asked participants to fill out a name card and Plaintiff asked them to do the same thing again later in the same class.  Termination Documentation at 10-11.  Finally, Zeidler expressed that he had doubts regarding not only whether Plaintiff would be able to facilitate the IBP class on her own but also whether she should could facilitate any class, based upon what he considered her limited efforts to provide examples.  Lachance Declaration ¶21, Termination Documentation at 10-11.

On March 7, 2001, Lachance spoke with Plaintiff and advised her that he had decided to take her out of the MDC role, and he

wrote a memorandum immediately thereafter summarizing his recollection of their conversation. See Termination Documentation at 11. Lachance acknowledged that Plaintiff had received "good marks" on participant evaluations (4's and 5's on a 1-5 scale) submitted in connection with her facilitation of a "Spotlight on Development" workshop, but Lachance largely dismissed that fact, stating that such was expected for a class she had known since June 2000. Id. More significant to Lachance, he indicated, was the issue of Plaintiff's decision not to co-facilitate the February 2001 IBP workshop. According to Lachance's memo, Plaintiff told him that she "chose not to facilitate the IBP with Pete Zeidler due to 'lack of familiarity with the new way of doing the class.'" Id. She subsequently admitted later, however, that she "was scared of 'everyone watching my every move." Id. Lachance noted that Plaintiff had actually facilitated IBP workshops for 10 months, and while he conceded that the approach had been altered for the February workshop, the content was essentially the same. Id. at 11-12. Thus, he questioned why she could not facilitate a class she already knew so much about. Id. Lachance also alleges that Plaintiff had actually agreed during their conversation "that she very well could have selected to facilitate some portions of the class." Id. When he mentioned to Plaintiff that observers saw her as unfocused and inattentive, she raised for the first time the

excuse that she had not been feeling well at the time of the workshop.  Id. at 12. Lachance suggested that he doubted that such was the true reason for her failure to participate fully given that she had waited until long into their conversation to bring it up. Id.  Several days later, on March 13, 2001, Lachance advised her that the company was not going to put her in another position and that her employment was terminated.

### III.  ANALYSIS

Plaintiff asserts that TeleTech is liable for allegedly terminating her employment because of race.  Such is her only

remaining disputed claim.[7]    Title VII[8] and Section 1981[9] each prohibit an employer from discharging an individual because of race.    See, e.g., United States v. Crosby, 59 F.3d 1133, 1135 (11th Cir. 1995); Andrews v. Lakeshore Rehabilitation Hosp., 140 F.3d 1405, 1410 (11th Cir. 1998).    The Eleventh Circuit has further recognized that claims alleging unlawful disparate treatment in employment based upon race have the same substantive proof requirements under Title VII and Section 1981 and are analyzed

---

[7]In addition to her termination claim, Plaintiff also seems perhaps to assert in the amended complaint vague claims that she was subjected to "[a]dverse [t]erms, [c]onditions & [p]rivileges" of employment because of race, in violation of Title VII and Section 1981. Although it is not entirely certain, these claims may be founded upon her exclusion from CLT meetings and allegations that she did not receive certain memos.    See Amended Complaint at ¶20. TeleTech has moved for summary judgment on these claims, see TeleTech's Summary Judgment Brief at 24-26, and Plaintiff has said nothing about them in her opposition brief. "There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment. Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned." Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995) (citation omitted). Further, even if Plaintiff has not formally abandoned these claims, she has failed to present any evidence to support them in response to TeleTech's motion for summary judgment. Accordingly, the Court concludes that TeleTech is entitled to summary judgment on Plaintiff's "adverse terms, conditions & privileges" claims under Title VII and Section 1981.

[8]Title VII prohibits an employer from "discharg[ing] any individual or otherwise discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

[9]Section 1981 guarantees to all persons in the United States "the same right ... to make and enforce contracts ... as is enjoyed by white citizens." 42 U.S.C. § 1981(a). Following the passage of the Civil Rights Act of 1991, the term "make and enforce" is broadly defined as including "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b).

under the same framework. See, e.g., Bass v. Board of County Com'rs, Orange County, Florida, 256 F.3d 1095, 1109 n. 4 (11th Cir. 2001); Standard v. A.B.E.L. Services, Inc., 161 F.3d 1318, 1330 (11th Cir. 1998). Thus, the Court will address TeleTech's arguments that it is entitled to summary judgment on Plaintiff's Title VII claim with the express understanding that the analysis applies with equal force to her Section 1981 claim. See Standard, 161 F.3d at 1330.

Because Plaintiff attempts to prove her termination claims using circumstantial evidence,[10] the Court applies the burden-shifting framework established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and Texas Department of Community Affairs v. Burdine, 450 U.S. 248 (1981). Under this analysis, a plaintiff must first establish a prima facie case of discrimination, which creates a presumption of discrimination. The employer must then produce sufficient evidence to indicate that it took the employment action in question for one or more legitimate, nondiscriminatory reasons. If the employer does so, the presumption of discrimination drops from the case, and the burden shifts back to the plaintiff to discredit the proffered

---

[10]Plaintiff does not contend that she might offer direct evidence or statistical evidence of race discrimination, the other avenues by which she might have attempted to prove her Title VII discrimination claim. See Standard, 161 F.3d at 1330.

nondiscriminatory reasons by showing that they are merely a pretext for unlawful discrimination.   See McDonnell Douglas, 411 U.S. at 802-05; Burdine, 450 U.S. at 252-256.

TeleTech contends that in order to establish a prima facie case of discrimination under Title VII and Section 1981, Plaintiff must prove "(1) that [s]he is a member of a protected minority; (2) that [s]he was qualified for the job from which [s]he was discharged, (3) that [s]he was discharged, and (4) that [her] former position was filled by a non-minority." Jones v. Lumberjack Meats, Inc., 680 F.2d 98, 101 (11th Cir. 1982).  TeleTech appears willing to assume for purposes of its summary judgment motion that Plaintiff is African-American, that she was discharged, and that she was replaced by a white male.  TeleTech urges, however, that Plaintiff cannot show that she was "qualified" to hold her MDC position and that her prima facie case thus fails.   More specifically, TeleTech maintains that Plaintiff's allegedly deficient job performance demonstrates that she lacked the facilitation, preparation, and organizational skills required for the MDC position.  However, as it finds that the motion for summary judgment can be resolved on other grounds, the Court will simply assume that the evidence is sufficient to show that Plaintiff was at least minimally qualified for her position and that she can,

therefore, make out a prima facie case.[11]

There is no dispute that TeleTech has produced sufficient evidence to satisfy its burden of production at the intermediate stage of the McDonnell Douglas/Burdine analysis to indicate that Plaintiff was fired for legitimate reasons other than race. Lachance states that he made the decision to terminate her employment because she declined to co-facilitate the IBP class with Zeidler in February 2001, coupled with continual dissatisfaction with her performance, based upon his assessment of her work as displayed through the performance appraisals he received from Kells, Mitchell, Clark, DeAnda, White, Phillips, Zeidler, and Walker.  Lachance Declaration at ¶¶21-22.

In order to survive summary judgment, Plaintiff must now

---

[11]The Court would also note that "[w]hether an employee possesses the qualifications for a position is . . . generally distinct from the issue whether [s]he performed the job satisfactorily." Clark v. Coates & Clark, Inc., 990 F.2d 1217, 1227 n.3 (11th Cir. 1993).  Indeed, the Eleventh Circuit has recognized that the McDonnell Douglas test may be modified in cases where a plaintiff was discharged from a previously held position (as opposed to failure-to-hire or failure-to-promote cases), by removing the prong requiring proof of qualification, on the grounds that "where a plaintiff has held a position for a significant period of time, qualification for that position, sufficient to satisfy the test of a prima facie case can be inferred." Pace v. Southern Railway Sys., 701 F.2d 1383, 1386 n.7 (11th Cir. 1983) (emphasis original).  See also Crapp v. City of Miami Beach, 242 F.3d 1017, 1020 (11th Cir. 2001); Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1360 (11th Cir. 1999); Young v. General Foods Corp., 840 F.2d 825, 830 n.3 (11th Cir. 1988); Rosenfield v. Wellington Leisure Products, Inc., 827 F.2d 1493, 1495 n.2 (11th Cir. 1987).  Plaintiff held the MDC position for almost exactly 16 months.  TeleTech contends that such is not a "significant" enough period to allow an inference of qualification on her prima facie case.  However, the Court pretermits any further discussion of this issue, as its resolution, the Court concludes, is not required to decide TeleTech's motion for summary judgment.

create a genuine issue of material fact as to whether the reasons advanced by TeleTech are merely a pretext for race discrimination. Bogle v. Orange County Bd. of County Com'rs, 162 F.3d 653, 658 (11th Cir. 1998).  In other words, Plaintiff must point to sufficient evidence to allow a fact finder reasonably to conclude, at a minimum, that the proffered reasons were not actually the motivation for her termination.  See Chapman v. AI Transport, 229 F.3d 1012, 1024-25 (11th Cir. 2000) (en banc); Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997).  Plaintiff may do this (1) by showing that the legitimate nondiscriminatory reasons should not be believed or (2) by showing that, in light of all of the evidence, discriminatory reasons more likely motivated the decision than the proffered reasons.  Mayfield v. Patterson Pump Co., 101 F.3d 1371, 1376 (11th Cir. 1996).  See also Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 148 (2000) (holding that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated," but cautioning that such a showing may not always be adequate to sustain a finding of unlawful discrimination).  Plaintiff takes both routes, as she attempts to show that race was more likely the reason for her discharge and to cast doubt on the credibility of TeleTech's

assertions of deficient performance.

In attempting to show that race was more likely the reason for her termination, Plaintiff points to evidence that Michelle Kells and Chris Mitchell had made statements suggesting they each had a racial bias.  More specifically, Plaintiff claims that Kells made a comment about "blacks not being good decision makers," and a comment about "blacks not being quick learners."  Watts-Anderson-Anderson Depo. at 196.  She similarly alleges that, during a mediation session with the Equal Employment Opportunity Commission, she heard played an audio tape upon which Mitchell allegedly said, "You black people make me sick."  Id.[12]

It is undisputed, however, that neither Kells nor Mitchell made the formal decision to terminate Plaintiff's employment.  Comments indicating an improper bias on the part of employees who did not participate in a challenged employment decision generally cannot raise an inference of discrimination or pretext on the part of the employer.  Miller v. Bed, Bath & Beyond, Inc., 185 F. Supp. 2d 1253, 1272 (N.D. Ala. 2002).  Thus, if the record demonstrates that neither Kells nor Mitchell reasonably could be said to have

---

[12]TeleTech claims that Plaintiff's testimony regarding what she heard on the tape is inadmissible because the tape was requested during discovery but not produced and because Plaintiff heard the tape during settlement negotiations with the EEOC.  Because the Court concludes that TeleTech is entitled to summary judgment regardless of whether Plaintiff's testimony about Mitchell's alleged statement is considered, the Court will assume that such testimony is admissible.

been decisionmakers, any racist remarks they may have made would not be probative of pretext.  The record is clear that Lachance made the formal termination decision, and Plaintiff concedes that there is no evidence that Lachance, who had also hired Plaintiff into the MDC position, himself had a racial animus.[13]  Nonetheless, Plaintiff contends that, even assuming Lachance himself had no racial bias, his determination was based upon what Plaintiff asserts were racially-motivated, unfavorable recommendations and allegedly false and misleading complaints about her performance that were made to him by Kells particularly, but also perhaps by Mitchell as well.

Plaintiff thus asserts that she might prevail on her claim under what is known as a "cat's paw" theory.  This doctrine provides that a plaintiff may prove that unlawful discrimination caused her to suffer an adverse employment action despite the innocence of the employer's nominal decisionmaker by showing that such innocent party simply relied upon, without himself evaluating

---

[13]"When the same actor hires a person . . . within the protected class, and then later fires that same person, 'it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire.' " Carlton v. Mystic Transp., Inc., 202 F.3d 129, 137 (2nd Cir. 2000) (quoting Grady v. Affiliated Cent., Inc., 130 F.3d 553, 560 (2nd Cir. 1997)).  Thus, "[e]vidence that the same actor both hired and fired the plaintiff, in some circumstances, may help to convince a jury that the defendant's proffered legitimate reasons for its decision are worthy of belief."  Williams v. Vitro Services Corp., 144 F.3d 1438, 1443 (11th Cir. 1998). However, the Eleventh Circuit has cautioned that "it is the province of the jury rather than the court, however, to determine whether the inference generated by 'same actor' evidence is strong enough to outweigh a plaintiff's evidence of pretext."  Id.

the plaintiff's situation, a recommendation or false information offered by someone else because of a prohibited animus. See Wright v. Southland Corp., 187 F.3d 1287, 1304 n.20 (11th Cir. 1999); Stimpson v. City of Tuscaloosa, 186 F.3d 1328, 1331-32 (11th Cir. 1999); Llampallas v. Mini-Circuits, Lab, Inc., 163 F.3d 1236, 1249 (11th Cir. 1998).  In such circumstances, it can be said that the recommending employee is the de facto decisionmaker, in that he uses the nominal decisionmaker as a mere conduit or cat's paw to give effect to his discriminatory animus. Stimpson, 186 F.3d at 1332; Llampallas, 163 F.3d at 1249.  However, the fact that a supervisor takes an employment action based upon a recommendation or information provided to him by others does not, standing alone, necessarily imply that the supervisor may be viewed as having being utilized as the cat's paw of the recommending employee.  If instead of merely tacitly approving or otherwise "rubber stamping" another's adverse recommendation or allegations, the decisionmaker conducts an "independent investigation" into the allegations against the plaintiff, any causal link between the recommender's prejudice and the adverse employment action is severed. See id.; Llampallas, 163 F.3d at 1249.

The Court concludes that the evidence here does not reasonably indicate that Lachance was the cat's paw of either Kells or Mitchell, or of anyone else for that matter.  Because Lachance was

based in Denver and rarely visited the Fairfield Facility, he admittedly was forced to rely upon evaluations offered by others with respect to certain aspects of Watts-Anderson-Anderson's day-to-day work, including her facilitation skills[14] and her ability to influence decisionmaking at the Fairfield Facility. However, there is nothing to indicate that Lachance discharged Plaintiff based entirely upon evaluations and complaints brought by those with an alleged racial bias.

Lachance maintains that he fired Plaintiff because of her decision not to co-facilitate the IBP workshop in February 2001 and her allegedly poor showing in the limited role she did assume there, coupled with "continual dissatisfaction" with her performance up to that time. It is true that such dissatisfaction prior to the February workshop may have initially been sparked by negative reports Lachance received from several employees who had observed Plaintiff's performance, and some of those negative

---

[14]For purposes of summary judgment, the Court assumes that Lachance himself never actually saw Plaintiff facilitate any class other than when she gave a presentation while interviewing for the MDC position. The Court recognizes that Lachance asserts that, while co-facilitating a class at the Fairfield Facility in about May or June 2000, he did observe Plaintiff employing her facilitation skills, and that certain alleged deficiencies he perceived at that time caused him to question whether she was right for her job. See Lachance Declaration ¶¶ 11-14. However, viewing the evidence in the light most favorable to the non-movant, the Court assumes that such observation did not take place, based upon Plaintiff's testimony that Lachance acknowledged to her during their January 2001 conversation addressing her performance that he had never seen her facilitate except for during a promotion interview in about November 1999. See Plaintiff's Depo. at 137.

reports came from Kells and Mitchell.  However, even if it is assumed that the evidence reasonably allows a finding that the complaints of Kells and Mitchell were influenced by race, which is not a given,[15] the record indicates that similar negative criticism of Plaintiff's work was also leveled by four other TeleTech employees, two of whom, Gemel Clark and Kimberly White, are African-American.  There is no evidence that these four other employees were at all motivated by race giving their assessments of Plaintiff's performance.  Moreover, it is undisputed that Lachance actually solicited multiple employees to provide such feedback in an affirmative attempt to make his own informed determination of Plaintiff's performance.  But more important to the cat's paw inquiry, the record shows that Lachance had a meeting with Plaintiff on or about January 3, 2001 and discussed with her what he perceived to be her performance problems and what was expected of her.  At that time, and in a subsequent exchange of e-mails between January 5 and 10, 2001, Lachance gave Plaintiff a full

---

[15]The racist comments Plaintiff ascribes to Kells and Mitchell are general in nature and do not relate directly to Plaintiff, her work performance, or the negative reports Kells and Mitchell submitted to Lachance about Plaintiff.  However, evidence of a generalized racial bias on the part of a decisionmaker, while not constituting direct evidence that race played a role in a particular employment decision, can contribute to a circumstantial case for pretext.  Rojas v. Florida, 285 F.3d 1339, 1343 (11th Cir. 2002).  On the other hand, the Court would note that Plaintiff herself suggested during her deposition that Kells complained about her performance in order to have Gemel Clark, another African-American female, placed into her MDC position, Plaintiff's Depo. at 163, which would seem inconsistent with her claim that Kells wanted her removed from her position because of race.

opportunity to explain or rebut the allegations of deficient performance, which she did, in fact, attempt to do.   See Termination Documentation 4-7.   These communications between Lachance and Plaintiff demonstrate that the former was not acting as a mere cat's paw, because he did not simply accept and then act upon the negative evaluations submitted by others without himself attempting to assess Plaintiff's situation.   See Llampallas, 163 F.3d at 1249 (citing Willis v. Marion County Auditor's Office, 118 F.3d 542, 547 (7th Cir. 1997)).

Likewise, the negative report about Plaintiff's performance at the February IBP workshop that Lachance alleges finally triggered him to remove her from her post was delivered not by Kells or Mitchell but by Peter Zeidler.   Zeidler's allegations, that Plaintiff backed out of the program at the last minute and was unable to give appropriate examples of the material, were certainly unfavorable.   And while Plaintiff now disputes the accuracy of Zeidler's substantive allegations, she points to no evidence suggesting that Zeidler was possessed of racial animus or that race played any role in influencing his report to Lachance.   And as he did with regard to prior allegations that Plaintiff's work performance was deficient, Lachance spoke with Plaintiff on March 7, 2001, several days before terminating her employment, and gave her a chance to explain why she did not fully participate in the

workshop and to respond to reported observations that she was unfocused and inattentive during the program.  Because Lachance discussed these matters relating to the critical February IBP workshop, it is evident that he did not simply rubber stamp Zeidler's version of events.  Llampallas, supra.

Based on the foregoing, the Court concludes that the evidence shows without dispute that Lachance was not only the nominal decisionmaker in Plaintiff's discharge, but the sole actual decisionmaker as well.  Thus, this is not a cat's paw case. Because it cannot reasonably be said that Kells or Mitchell actually participated in the decision to terminate Plaintiff, any comments they made indicating a racial bias do not constitute evidence of pretext.  Miller, supra.

Plaintiff also attempts to show pretext by proving that the reasons offered by TeleTech are unworthy of credence.  Her primary line of argument on this front consists of her own allegations that she had good facilitation skills and overall work performance and that contrary assertions made by Lachance, Phillips, Clark, Zeidler, Kells, and anyone else are simply their own subjective opinions.  More specifically, Plaintiff claims that she performed her job professionally and knowledgeably and that she answered all questions from class participants "to the best of [her] ability with the information that was provided to [her]."  Plaintiff

Affidavit, Exhibit 4 to Plaintiff's Evidentiary Submission ("Plaintiff Affidavit") at 1.   She also alleges that the evaluations she received from class participants indicated that she presented the material in a manner that was understandable and relevant to the participants' jobs.  Id. at 2.   She denies all allegations that she did not understand the material she was teaching or that she was unprepared for any classes except when Kells and Mitchell refused to provide her requested information. Id.  Finally, Plaintiff also specifically contests (1) Clark's assessments that her classes "dragged" or that her participants "lost focus," (2) Phillips's allegations that she simply read materials from overhead slides and kept her back to the audience; and (3) that she ever told Zeidler that she was unprepared to conduct her portion of the February 2001 IBP workshop or that the examples she provided during that workshop were inappropriate.  Id. at 2.

The fundamental problem with this line of argument is that it fails to recognize that proving pretext requires more than showing that the employer was wrong in its assessment of the underlying facts or was otherwise lacking in wisdom.  As the Eleventh Circuit has explained, federal courts

> do not . . . sit as a superpersonnel department that
> reexamines an entity's business decisions.  No matter how
> medieval a firm's practices, no matter how high-handed

> its decisional process, no matter how mistaken the firm's
> managers, [federal anti-discrimination laws] [do] not
> interfere.  Rather, our inquiry is limited to whether the
> employer gave an honest explanation of its behavior.

Chapman, 229 F.3d at 1030 (quoting Elrod v. Sears, Roebuck & Co.,

939 F.2d 1466, 1470 (11th Cir. 2000)).  "Evidence showing a false

factual predicate underlying the employer's proffered reason does

not unequivocally prove that the employer did not rely on the

reason in making the employment decision.  Instead, it may merely

indicate that the employer, acting in good faith, made the disputed

employment decision on the basis of erroneous information." Walker

v. NationsBank of Florida N.A., 53 F.3d 1548, 1564 (11th Cir. 1995)

(Johnson, J., concurring specially).  Thus, for Plaintiff, creating

a genuine issue of fact regarding pretext is not a matter of simply

presenting sufficient evidence to allow a jury to find that it, or

some hypothetical, objectively reasonable employer, would have

considered her actual work performance to be satisfactory in the

areas of asserted deficiency.  Rather, she generally must offer

sufficient proof to allow a finding that the person or persons who

made the employment decision on behalf of the employer did not

believe that her work performance was unsatisfactory.  See Walker,

53 F.3d at 1564 & n.7; Damon v. Fleming Supermarkets Of Florida,

Inc., 196 F.3d 1354, 1363-64 (11th Cir. 1999).  For example, where

the decisionmaker relies upon a subordinate's report alleging that

a plaintiff's performance was deficient, the plaintiff must point to evidence that suggests that the decisionmaker either did not rely on that report or that the decisionmaker did rely upon the report but knew it was false.  Cf. Sweeney v. Alabama Alcoholic Beverage Control Bd., 117 F. Supp. 2d 1266, 1272-73 (M.D. Ala. 2000) (discussing proof of pretext where the employer relies upon a subordinate's report that the plaintiff violated a work rule).

None of the evidence cited by Plaintiff tends to suggest that the relevant decisionmaker, Lachance, did not honestly and in good faith believe that her work performance was unsatisfactory in the ways he cites.  She strenuously urges that her performance was good in all relevant respects.  However, this gains her little, as the "pretext inquiry is concerned with the employer's perception of the employee's performance, not the employee's own beliefs." Standard, 161 F.3d at 1332-33.  Plaintiff also claims that all of the employees who presented Lachance with negative feedback about her performance are either lying or mistaken.  To the extent that one or more of these other employees might have been motivated to lie for reasons of race, the Court has previously explained that because Lachance himself spoke with Plaintiff and otherwise investigated her situation before acting, the link between any racial bias on the part of those other employees is severed.  And insofar as Lachance, after looking into the situation, put stock in

those negative reports that Plaintiff claims are erroneous, such may indicate that he may have been mistaken in his conclusions about certain aspects of her work performance, but such does not suggest he was lying about having reached those conclusions.

Further, it appears that Plaintiff herself gave Lachance good cause to believe the key allegations of poor performance leveled against her by Zeidler regarding the February 2001 IBP workshop. In particular, Lachance's notes of the conversation he had with Plaintiff a week before he terminated her suggest that Lachance queried her about Zeidler's allegations and that she did not materially dispute them.  Specifically, Lachance indicated that Plaintiff then acknowledged that she "chose not to facilitate the IBP with Pete Zeidler due to 'lack of familiarity with the new way of doing the class'" and because she "was scared of 'everyone watching my every move.'"  Termination Documentation at 11-12. Lachance further stated that she had agreed during their conversation "that she very well could have selected to facilitate some portions of the class." Id. at 12.  And finally, Lachance claims that when he mentioned to her that observers saw her as unfocused and inattentive during the IBP presentation, she did not contest the accuracy of the observations but instead raised the excuse that she had not been feeling well at the time. Id.  While Plaintiff suggests that she may have been on medication at the time

she had this conversation with Lachance and that she may have said some things that were "taken out of context," she does not dispute that she made the acknowledging statements to Lachance.   See Plaintiff's Depo. at 155.   Therefore, even if Zeidler's substantive allegations were, in fact, false, Plaintiff's failure to contest them when confronted by Lachance gave him good reason to believe that they were true, substantially undercutting her claim of pretext.  See Elrod, 939 F.2d at 1470; Jones v. Gerwens, 870 F.2d 1534, 1540 (11th Cir. 1989).

Next, Plaintiff suggests that TeleTech's asserted justifications for her discharge are suspect because she alleges that she did not receive any complaints for or discipline regarding poor job performance before she was terminated.  And in a somewhat related argument, Plaintiff contends that TeleTech allegedly violated its own progressive disciplinary policy by firing her without first imposing a warning or a lesser sanction.  It is true that an employer's failure to follow its own policies may tend to support a finding of pretext.  Bass v. Board of County Com'rs, Orange County, Fla., 256 F.3d 1095, 1108 (11th Cir. 2001).  However, it is undisputed that Plaintiff had a conversation with Lachance on or about January 3, 2001, more than two months before she was terminated, in which he made it very clear that he perceived her work performance to be deficient in certain key respects and that

her future in the MDC role was in jeopardy.   Thus, Plaintiff's
arguments that she received no complaints or discipline regarding
her work performance prior to being terminated are unsupported by
the evidence.

Finally, Plaintiff attempts to show pretext by offering
evidence that a white employee, Operations Manager Michael Webb,
had similar job performance problems but was not terminated.   Webb
allegedly had problems with his communications skills, and his team
had a history of low productivity and efficiency.   Both Kells and
Mitchell issued written warnings to Webb for poor job performance.
Further, they also discussed whether to fire Webb, but they
ultimately decided not to do so.   Therefore, Plaintiff argues, Webb
was treated more favorably than she was, suggesting that the
reasons offered for terminating her are pretext.   The Court
disagrees.

Instances of disparate treatment can support a claim of
pretext, but a plaintiff has the burden of proving that she and the
disparately treated white were "similarly situated in all relevant
respects."  Harvey v. Anheuser-Busch, Inc., 38 F.3d 968, 972 (8th
Cir. 1994) (citation omitted).  Accord Holifield v. Reno, 115 F.3d
1555, 1562 (11th Cir. 1997).  As an initial matter, the Court notes
that the record is undisputed that Lachance did, in fact, warn
Plaintiff about her perceived poor performance more than two months

before he fired her.  So the record does not support the
proposition that Webb was given the benefit of progressive
discipline while Plaintiff was not.  In addition, it is undisputed
that Webb held a different position with different job
responsibilities than did Plaintiff. Webb also answered to a
different supervisor for purposes of assessing work performance and
receiving discipline.  Finally, Plaintiff has failed to show with
any specificity how her allegedly deficient job performance was
actually similar to that of Webb so as to establish him as a valid
comparator.  Plaintiff merely argues vaguely that she and Webb
"engag[ed] in the same alleged misconduct, poor performance," and
that she was terminated while he was only warned.  Plaintiff's
Brief in Opposition at 24.  However, given the obvious range of
possible different natures and levels of "poor performance,"
particularly by employees in different jobs, the Court concludes
that Watts-Anderson has failed to offer sufficient evidence to show
that she and Webb were similarly situated.  Therefore, this pretext
argument fails.

The Court concludes that Plaintiff has failed to point to
sufficient evidence indicating that the reasons proffered by
TeleTech are but a pretext for unlawful race discrimination.
Therefore, the Court determines that TeleTech is entitled to
summary judgment on Plaintiff's Title VII and Section 1981 claims

alleging that she was discharged from her employment because of race.

### IV.   CONCLUSION

Based on the foregoing, TeleTech's motion for summary judgment on the claims brought against it by Plaintiff (Doc. 41) is due to be **GRANTED**.  The Court finds that there are no genuine issues of material fact and that TeleTech is entitled to judgment as a matter of law on Plaintiff's claims.  Fed. R. Civ. P. 56(c).  Further, the Court has reached this conclusion without considering the statements that are the subject of Plaintiff's motion to strike (Doc. 50).  Therefore, that motion is due to be deemed **MOOT**.  A separate order shall be entered.

**IT IS SO ORDERED**, this ___14th___ day of June, 2002.

_____
H. DEAN BUTTRAM, JR.
UNITED STATES DISTRICT JUDGE